**BURSOR & FISHER, P.A.**
Sarah N. Westcot
Stephen A. Beck
701 Brickell Avenue, Suite 2100
Miami, FL 33133
Telephone:  (305) 330-5512
Facsimile:  (305) 679-9006
Email:       swestcot@bursor.com
               sbeck@bursor.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| DOMINIQUE POLLARD, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> DECA DENTAL MANAGEMENT, LLC d/b/a DECA DENTAL GROUP, <br><br> Defendant. | Case No. 6:26-cv-00102 <br><br> **JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Dominique Pollard ("Plaintiff") bring this class action complaint individually and on behalf of all others similarly situated individuals (the "Class Members"), against Defendant DECA Dental Management d/b/a DECA Dental Group ("Ideal Dental").  Plaintiff brings this action based upon personal

1

knowledge of the facts pertaining to herself, and upon information and good faith belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all Ideal Dental patients who accessed dental services on the website https://www.myidealdental.com (the "Website").  Defendant purports to provide "clinical excellence, convenience, and modern comfort" while providing "[a]ll dental specialists under one roof – from general dentistry to emergency care, orthodontics to oral surgery."[1]

2.      However, in pursuit of profit and without regard for their patients' medical privacy, Defendant aids, employs, agrees, and conspires with third parties, such as Google LLC ("Google"), to intercept patients' communications as they seek dental services and book medical appointments on its Website.  This is achieved through Defendant's secret installation of complex computer code on the Website which serves to track and disclose Ideal Dental's patients' activity, in real time to third parties, such as Google.

3.      Confidentiality is paramount to the health and dental industries. Respecting a patient's decision to exercise their autonomy in providing personal

---

[1] https://myidealdental.com.

2

and sensitive details about their health is vital in building trust with their clinicians. "The requirement for confidentiality is mentioned in all codes of ethics as well as the Hippocratic oath."[2]

4.     When a patient pursues dental care, they are legally entitled to protection from the unauthorized disclosure of their information to third parties.

5.     When patients know their information is secure, they are more likely to pursue important dental health services.

6.     Information related to dental health treatment is protected by state and federal law, including but not limited to, the Health Insurance Portability and Accountability Act ("HIPAA") and Section 456.057 of the Florida Statutes. Dental healthcare providers, like Ideal Dental, are legally required to safeguard patients' confidential and sensitive health information.  This means that any data related to a patient's dental health and treatment history, including patient status, must be kept confidential and secure.  Given these protections, patients reasonably expect that information related to their dental health treatment will remain confidential.

7.     Despite its legal and ethical duties to maintain its patients' confidential information, Defendant instead secretly discloses Plaintiff's and Class Members' sensitive and confidential medical information with third parties.  In

---

[2] https://www.dentalcare.com/en-us/ce-courses/ce510/confidentiality.

doing so, Defendant undermined the importance of safeguarding the identities and personal medical information of individuals seeking dental services and breached its patients' trust—violating state and federal law.

8. Unbeknownst to Plaintiff and Class Members, and contrary to Defendant's duties as a dental provider, Defendant discloses its patients' protected health information ("PHI") to third parties, including Google, for targeted advertising purposes. This PHI includes, but is not necessarily limited to, the individual's status as a patient and the specific dental services they are receiving. Plaintiff brings this action for legal and equitable remedies resulting from Defendant's illegal actions.

## THE PARTIES

9. Plaintiff Dominique Pollard is a resident of Orlando, Florida. In or around March 2025 Plaintiff used the Website to make an appointment for dental services with Ideal Dental.[3] At all times relevant hereto, Plaintiff maintained an active Google account.

10. Unbeknownst to Plaintiff, Defendant disclosed her PHI—including the specific details about her dental appointments—to Google for targeted advertising purposes. These details included the nature of the dental services she

---

[3] The specific dental services received by Plaintiff have been intentionally omitted to protect her privacy.

received.  Defendant also disclosed sufficient personally identifiable information ("PII") for Google to identify Plaintiff as the specific individuals booking her dental appointments, including her email address, as described more thoroughly below.

11.    Plaintiff used the same device and browser used to access her Google accounts when booking her medical appointments on the Website.  After booking appointments on the Ideal Dental Website, Plaintiff began receiving targeted advertisements for similar products and services.  However, Plaintiff did not know, nor could she have known, that the reason she was receiving such advertisements was due to Defendant's unlawful disclosure of her PHI.  Plaintiff would not have booked an appointment on the Website if she knew Defendant was violating her privacy by sharing her PHI with unknown third parties.

12.    When registering for her Gmail account, Google required that she provide her full legal name, date of birth, and gender.  Every time Plaintiff accesses her Gmail account, Google collects information related to her IP address and electronic device (e.g., browser, operating system, screen resolution, etc.) and stores it in a profile maintained by Google for targeted advertising purposes. Google also utilizes other features, such as generating specific User IDs, to track its users across web browsing sessions for identification purposes, as detailed

5

below.  Google utilizes all of these tracking features in order to build robust consumer profiles it can then leverage for targeted advertising purposes.

13.    Defendant DECA Dental Management, LLC d/b/a DECA Dental Group is a Texas-based LLC with its principal place of business in Dallas, Texas. Defendant Ideal Dental owns and operates the Website.  Defendant DECA Dental Management, LLC d/b/a DECA Dental Group owns the consumer-facing brand Ideal Dental.[4]  Defendant's Website connects patients with 160 practices across the United States, including its approximately 20 practices in Florida.[5]  Within this District alone there are approximately 16 locations.[6]

14.    Defendant chose to embed the DoubleClick API and Google Analytics tracking code (collectively the "Tracking Technologies") on the Website, whereby it disclosed the confidential PHI of its patients with Google for targeted advertising purposes.  Defendant did this without authorization or consent from its patients.  Had Defendant complied with the law, it would not have received the information and marketing services it received.

---

[4] https://decadental.com/leadership/dr-sulman-ahmed/.

[5] https://www.myidealdental.com/locations/all.

[6] *Id.*

6

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511).  This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from at least one defendant.

16.     This Court has personal jurisdiction over Defendant because Defendant purposefully directs its business activities in this district by offering its services to residents of this District and performing services in this District.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred in this District and Defendant conducts substantial business within this District.  Further, the interception and disclosure of Plaintiff's personal information occurred in this District.

## FACTUAL ALLEGATIONS

### A.    Health Information is Sensitive and Confidential

18.    Defendant, through the Tracking Technologies, disclosed information that is sensitive, confidential, and personally identifiable to Google, one of the largest data and technology companies in the world.

19.    Defendant owns and operates the Website where its patients can schedule dental appointments, including general and specialized dental care for a wide array of dental services.

20.    Under federal law, a healthcare provider may not disclose personally identifiable information ("PII") or PHI without the patient's express written authorization.[7]  In this case, PHI includes, but is not necessarily limited to, patient appointment information.

21.    The United States Department of Health and Human Services ("HHS") has established a national standard, known as the HIPAA Privacy Rule ("Privacy Rule"), to explain the duties healthcare providers owe to their patients. "The Rule requires appropriate safeguards to protect the privacy of [PHI] and sets limits and conditions on the uses and disclosures that may be made of such

---

[7] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 165.508(a), 164.514(b)(2)(i).

information without an individual's authorization."[8] Those requirements include

the impermissible uses and disclosures of PHI.[9]

22.    In 2009, Congress enacted the Health Information Technology for

Economic and Clinical Health Act ("HITECH Act"), making business associates of

HIPAA covered entities directly liable for compliance with certain requirements of

the Privacy Rule.[10]

23.    A healthcare provider or business associate violates the Privacy Rule

if it knowingly and in violation of 42 U.S.C. §§ 1320d-d9 ("Part C"): "(1) uses of

causes to be used a unique health identifier; [or] (2) obtains individually

identifiable health information relating to an individual." [11]

24.    The statute states that an entity "shall be considered to have obtained

or disclosed individually identifiable health information in violation of [Part C] if

the information is maintained by a covered entity . . . and the individual obtained

or disclosed such information without authorization."  *Id.*

---

[8] U.S. Dept. of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

[9] U.S. DEPT. OF HEALTH & HUM. SERVS., DIRECT LIABILITY OF BUSINESS ASSOCIATES, https://hhs.gov/hipaa/for-professionals/privacy/guidance/business-associates/factsheet/index.html.

[10] American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat 115; *see also* 42 U.S.C. § 17931(b) (applying civil and criminal penalties to business associates for violations of 42 U.S.C. § 1320d-6).

[11] 42 U.S.C. § 1320d-6.

25.    The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant because it is knowingly disclosing individually identifiable health information relating to its patients.

26.    Defendant further failed to comply with other HIPAA safeguard regulations as follows:

    a.  Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. Section 164.306(a)(1);

    b.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.R.F. Section 164.308(a)(1);

    c.  Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. Section 164.308(a)(6)(ii);

    d.  Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. Section 306(a)(2);

    e.  Failing to protect against reasonably anticipated uses of disclosures of electronic PHI not permitted under privacy rules pertaining to

individually identifiable health information in violation of 45 C.F.R. Section 164.306(a)(3); and

f.  Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. Section 164.530(c).

27.    Health care organizations regulated under HIPAA, like Defendant, may use third-party tracking tools in a limited way to perform analysis on data key to operations.  They are not permitted, however, to use these tools in a way that may expose patients' PHI to vendors (as shown below).  As explained by a statement published by the HHS:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.  **For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.**[12]

28.    The Bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others.  For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination,

---

[12] HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (THE "BULLETIN") (EMPHASIS ADDED), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, **because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.**[13]

29.    Plaintiff and Class Members face exactly the risks over which the government expresses concern. Defendant's unlawful conduct resulted in third parties intercepting information relating to Plaintiff and Class Members' dental appointments when they accessed Defendant's Website.

30.    The Bulletin goes on to make clear how broad the government's view of protected information is. It explains:

This information might include an individual's medical record number, home or email address, or **dates of appointments**, as well **as an individual's IP address** or geographic location, medical device IDs**, or any unique identifying code.**[14]

31.    Crucially, the Bulletin continues:

**All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI**, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as **IP address** or geographic location, does not include specific treatment or billing

---

[13] *Id.* (emphasis added).

[14] *Id.* (emphasis added).

information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus **relates to the individual's past, present, or future health or health care** or payment for care. [15]

32.     Then, in July 2022, the Federal Trade Commission ("FTC") and the

Department of Health and Human Services ("HHS") issued a joint press release

warning regulated entities about the privacy and security risks arising from the use

of online tracking technologies:

> The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.
>
> "When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."
>
> "Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues

---

[15] *Id.* (emphasis added).

to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."

The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.

In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, **medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.**[16]

33.     The FTC is unequivocal in its stance. The FTC has specifically informed healthcare companies, like Defendant, that they should not use tracking technologies to collect sensitive health information and disclose it to third party advertising platforms without informed consent:

The FTC Act prohibits companies and individuals from engaging in unfair or deceptive acts or practices in or affecting commerce. This means you must ensure your health data practices aren't substantially injuring consumers, including by invading their privacy.

For instance, *BetterHelp*, *GoodRx*, and *Premom* make clear that disclosing consumers' health information for advertising without their affirmative express consent may be an unfair practice.

---

[16] Federal Trade Commission, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, July 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking. (emphasis added).

[I]f you use behind-the-scenes tracking technologies that share consumers' sensitive health data in contradiction of your privacy promises, that's a violation of the FTC Act.[17]

34.    Therefore, Defendant's conduct, as described herein, is directly contrary to federal law and the clear pronouncements by the FTC and HHS.

**B.    Google's Advertising Technology**

35.    Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications.  Each device (*e.g.*, computer, tablet, laptop, or smartphone) accesses web content through a web browser (*e.g.*, Chrome, Safari, Edge, etc.).

36.    Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

37.    Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- o  HTTP Request: an electronic communication sent from a device's browser to the website's server.  GET Requests are one of the most common types of HTTP Requests.  In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- o  Cookies: a small text file that can be used to store information on the

---

[17] https://www.ftc.gov/business-guidance/resources/collecting-using-or-sharing-consumer-health-information-look-hipaa-ftc-act-health-breach

device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

o  HTTP Response: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

38.    A consumers' HTTP Request essentially asks the Website to retrieve certain information (such as appointment booking information), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

39.    Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

40.    Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. The Tracking Technologies embedded on the Website by Defendant constitutes Source Code and function in a substantially similar way.

41.    Google is one of the most valuable publicly traded companies in the

16

world with a market capitalization of over $1 trillion dollars.  Google fancies itself

a "tech" company, but Google, at its core, is an advertising company.

42.    Google "make[s] money" from "advertising products [that] deliver

relevant ads at just the right time," generating "revenues primarily by delivering

both performance advertising and brand advertising."[18]  In 2020, Google generated

$146.9 billion in advertising revenue, which amounted to more than 80 percent of

Google's total revenues for the year. Google generated an even higher percentage

of its total revenues from advertising in prior years:

**Figure 1:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|---|---|---|---|
| 2021 | $257.6 billion | $209.5 billion | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

43.    Google offers several analytics products, including SDKs and a

tracking pixel, which exist solely to help drive ad revenue.  For instance, Google's

SDK and pixel integrate with Google's advertising offerings, such as Google Ads,

Search Ads 360, Google Cloud, and Google Ad Manager, to direct more

individuals to use Google's ad network and products increasing Google's overall

ad revenue.  Products like Google's SDK and its tracking pixel also improve the

---

[18] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at
https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

44.    One of these SDKs and tracking pixels is Google Analytics.  Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis.  In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions.  Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

45.    Google continued updating its analytics platform, launching Universal Analytics in 2012.  Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior.  Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

a.  *The Google Analytics Tracking Code*

46.    In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

47.    Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet.  Indeed, Google had a $62.6

billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

48.     Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[19]  It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[20]

49.     Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site—even when Ideal Dental patients are booking their appointments.  This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on.  The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or patient) is using to access a

---

[19] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Jan. 10, 2023).

[20] *Id.*

website. The device information intercepted by Google includes the patient's operating system, operating system version, browser, language, and screen resolution.

50. In other words, when interacting with the Website, an HTTP Request is sent to Ideal Dental's server, and that server sends an HTTP Response including the Markup that displays the website visible to the patient and Source Code, including Google's Tracking Technologies.

51. Thus, Defendant is essentially handing their patients a tapped device, and once the webpage is loaded onto the patient's browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for Defendant and transmits those communications to third parties like Google.

52. Once Google's software code collects the data intercepted from the Website, it packages the information and sends it to Google Analytics for processing. Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters. Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

53. After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages. These include reports on acquisition (e.g., information about where your traffic

20

originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

54.    In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

55.    The Website utilizes Google's pixel and SDK.  As a result, Google intercepted patients' interactions on the Website, including their PII and PHI. Google received at least "Custom Events" and URLs that disclosed the medical services being received by the patient.  Google also received additional PII, including the patients' IP address, device information, and User-IDs.

56.    For example, the Website utilizes Google's "cid" or "Client ID" function to identify patients as they navigate the Website.[21]

---

[21] Eduard Kozakov, *What Is Google Client ID In GA4: Detailed Setup Guide For 2024*, Owox, https://www.owox.com/blog/use-cases/google-analytics-client-id.

57.     In addition to User-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify consumers.  A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

58.     These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data.

59.     As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[22]

60.     The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[23]  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

---

[22] Justin Schuh, *Building a more private web*, GOOGLE, https://blog.google/products/chrome/building-a-more-private-web/.

[23] Chris Hauk, *What Is Browser Fingerprinting? How It Works And How To Stop It*, PIXEL PRIVACY, https://www.pixelprivacy.com/resources/browser-fingerprinting.

61.    In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[24]

62.    Browser-fingerprints are personal identifiers.  Google Analytics can collect browser-fingerprints from website visitors.

63.    As enabled by Defendant, Google collects vast quantities of consumer data through Google Analytics.

64.    Due to the vast network of consumer information held by Google, it is able to match the IP addresses, device information, and User-IDs it intercepts and link such information to an individual's specific identity.

65.    Google then utilizes such information for its own purposes, such as targeted advertising.

### b.  The DoubleClick API

66.    The DoubleClick API "is an integrated ad technology platform that enables advertisers to more effectively create, manage and grow high-impact digital marketing campaigns."[25]

67.    DoubleClick was acquired by Google in 2008.  In 2018, the DoubleClick API was integrated with the Google Analytics API into the Google

---

[24] Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features* (Network & Distributed Sys. Symp., 2017) https://www.ndss-symposium.org/wp-content/uploads/2017/09/ndss2017_02B-3_Cao_paper.pdf.

[25] *DoubleClick Digital Marketing*, GOOGLE, https://support.google.com/faqs/answer/2727482?hl=en.

Marketing Platform.[26]   The Google Marketing Platform makes use of most of DoubleClick's features, albeit under different brand names: for example, "DoubleClick Bid Manager is now Display & Video 360," "DoubleClick Search is now named Search Ads 360," and DoubleClick Campaign Manager and DoubleClick Studio are now named Campaign Manager and Studio, respectively."[27]

68.    As relevant here, however, data is still sent from the Website to Google through the DoubleClick API, and app developers like Defendants can then use the Google Marketing Platform to manage the data.

69.    Once integrated into a developer's mobile application, the DoubleClick API allows an app developer to, among other features, analyze and optimize marketing campaigns and conduct targeted advertising.[28]

70.    Once Defendants intercept the Website communications through the DoubleClick API and disclose such information to Google (in real time), Google has the capability to use such information for its own purposes.  "Google uses the information shared by sites and apps to deliver [] services, maintain and improve

---

[26] Brad Bender, *Introducing Google Marketing Platform*, GOOGLE MARKETING PLATFORM (June 27, 2018), https://www.blog.google//products/marketingplatform/360/introducing-google-marketing-platform/.

[27] *Introducing Google Marketing Platform*, GOOGLE, https://support.google.com/displayvideo/answer/9015629?hl=en

[28] *DoubleClick Digital Marketing*, GOOGLE, https://support.google.com/faqs/answer/2727482.

24

them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on [] partners' sites and apps."[29]

71.    For example, Google utilizes the "auid" or "Advertiser User ID" cookies which identify unique users and unique interactions with a website.

72.    Google's range of SaaS services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits.  This involves collecting visitor information from thousands of websites and then analyzing that information to deliver targeted advertising and group web users so that they can be targeted for products and categories they are interested in.

73.    Information from websites, like Defendant's Website, is central to Google's ability to successfully market their advertising capabilities to future clients.

74.    In sum, Google uses website communications to: (i) improve its own products and services; (ii) develop new Google for Business and Google Analytics products and services; and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

---

[29] *Privacy and Terms*, GOOGLE, https://policies.google.com/technologies/partner-sites.

75.     Google views and processes every piece of information collected from the DoubleClick API, including the information collected from Defendant's Website, and uses it to assist with data analytics, marketing, and targeted advertising.

76.     Google partners with Defendant in its marketing efforts.  The DoubleClick API is employed on the Website in the manner described throughout this Complaint.

**C.     Defendant Ideal Dental Violates the Privacy Rights of its Patients**

77.     Defendant Ideal Dental is a dental healthcare provider that uses its Website to connect patients with one of its 100+ locations across the United States.

78.     Defendant understands the information handled on its website is protected and confidential, as indicated by the Privacy Policy page on the Website where Defendant represents that "information collected is NOT Protected Health Information and is not shared outside of Deca Dental."[30]

79.     Unfortunately, Defendant Ideal Dental does not comply with its legal and ethical obligations.

80.     Defendant's Website is accessible on mobile devices and desktop computers and allows patients to communicate with Defendant regarding their medical care.

---

[30] *Privacy Policy*, IDEAL DENTAL, https://www.myidealdental.com/privacy-policy.

26

81.    Defendant allows its patients to access dental health services on the website, including the ability to book appointments on the Website.

82.    Unbeknownst to its patients, Defendant disclosed sensitive details about their dental appointments and personally identifiable information to Google through the Tracking Technologies.

83.    For example, when a patient books an appointment, Google receives the location of the appointment, the reason for the appointment, and that the patient booked an appointment.  *See* Figures 2 & 3.



*Figure 2:* Screenshot of Google Analytics' interceptions from Defendant's Website



**Figure 3:** Screenshot of DoubleClick's interceptions from Defendant's Website

84. Defendant further assists Google by disclosing the PII of its patients sufficient for Google to uncover their identities. For instance, in HTTP communications, the patient's IP address is inherently included in every network request. In addition to its patients' IP addresses, Defendant, through the Tracking Technologies, disclosed information about their specific devices, Advertiser User-IDs and User-IDs to Google, allowing Google to link such information to an individual's specific identity.

85. The information shared by Defendant allows Google to know the identities of specific individuals as well as information related to the reason they are booking an appointment (e.g., a general dentist exam, an ortho consult, an urgent/emergency, or any other appointment). *See* Figures 2 & 3. This allows

28

these companies, including Defendant, to profit from this information for targeted advertising purposes.

86. Defendant also uses and causes the disclosure of data sufficient for Google to create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications about their appointment details.

87. Finally, Defendant also discloses a hashed version of its patient's email address. For patients with a Gmail account, like Plaintiff, Google can readily uncover their identity.

88. Defendant sent these identifiers (*e.g.*, auid, cid, IP address, and device information) with each patient's "event" data.

89. Such event data includes the fact that a patient is seeking medical treatment (i.e., dental services) as well as the specific dental services they are seeking (e.g. "root canal").

90. When patients share their personal information with medical professionals, they expect this information to be kept confidential. Moreover, when consumers seek a specific treatment from medical professionals, they also expect this highly sensitive information to be kept confidential.

91. If patients knew Defendant was sharing their personal information for targeted advertising purposes, they would seek treatment with another company.

29

Through the above-listed third-party tracking services, which Defendant used via the software code installed, integrated, and embedded into the Website, Defendant disclosed their patients' legally protected PII and PHI.

92.     Defendant engages in this deceptive conduct for its own profit at the expense of their patients' privacy.  Such disclosures are an invasion of privacy, lead to harassing targeted advertising, and violate federal and state law.

### D.     Tolling of Claims

93.     Any applicable statutes of limitations have been tolled by Defendant's knowing and active concealment of its incorporation of the Tracking Technologies into its Website.

94.     The Tracking Technologies were and are entirely invisible to a website visitor.

95.     Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

96.     Plaintiff was ignorant of the information essential to pursue her claims, without any fault or lack of diligence on her part.

97.     Defendant had exclusive knowledge that its Website incorporated the Tracking Technologies and yet failed to disclose to its patients, including Plaintiff

and Class Members, that by booking dental appointments through the Website, Plaintiff's and Class Members' PHI would be disclosed or released to Google.

98.    Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its patients' PHI.  In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to its patients that it disclosed or released their PHI to unauthorized third parties.  Accordingly, Defendant is estopped from relying on any statute of limitations.

99.    Moreover, all applicable statutes of limitations have also been tolled pursuant to the discovery rule.

100.    The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of the Plaintiff's complaint in this matter.

## CLASS ACTION ALLEGATIONS

101.    Plaintiff brings this action on behalf of all persons in the United States who scheduled an appointment on the Website, www.myidealdental.com/ (the "Class").

102.    Plaintiff also brings this action on behalf of all persons in Florida who scheduled an appointment on the Website, www.myidealdental.com/ (the "Florida Subclass").

31

103. Excluded from the Classes are Defendant, the officers and directors of the Defendant at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which either Defendant has or had a controlling interest.

104. Plaintiff is a member of the Classes she seeks to represent.

105. The Classes are so numerous that joinder of all members is impractical. Although Plaintiff does not yet know the exact size of the Classes, it is believed that there are at least thousands of Class Members.

106. The Classes are ascertainable because the Class Members can be identified by objective criteria – all individuals who accessed www.myidealdental.com for dental services. Individual notice can be provided to Class Members "who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

107. There are numerous questions of law and fact common to the Classes, which predominate over any individual actions or issues, including but not limited to:

    a. Whether Defendant gave the Class Members a reasonable expectation of privacy that their information was not being shared with third parties;

b. Whether Defendant's disclosure of information constitutes a violation of the claims asserted;

c. Whether Plaintiff and Class Members are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct alleged herein; and

d. Whether Plaintiff and Class Members have sustained damages as a result of Defendant's conduct and if so, what is the appropriate measure of damages or restitution.

108. Plaintiff's claims are typical of the claims of the members of the Classes, as all members are similarly affected by Defendant's wrongful conduct. Plaintiff has no interests antagonistic to the interests of the other members of the Classes. Plaintiff and all members of the Classes have sustained economic injury arising out of Defendant's violations of law as alleged herein.

109. Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the Class Members she seeks to represent, she has retained counsel competent and experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of Class Members will be fairly and adequately protected by Plaintiff and her counsel.

110. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and Class Members. Each

individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims are consistently adjudicated.

111.   Plaintiff reserves the right to revise her allegations and class definition based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Florida Security of Communications Act
### Fla. Stat. 934.01, *et seq.*

112.   Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

113.   Plaintiff brings this Count individually and on behalf of the members of the Florida Subclass.

34

114.   The Florida Security of Communications Act ("FSCA") prohibits: (1) the interception or procurement of another to intercept any wire, oral or electronic communication; (2) the intentional disclosure of the contents of any wire, oral or electronic communication that the discloser knew or should have known was obtained through the interception of a wire, oral or electronic communication; and (3) the intentional use of the contents of any wire, oral or electronic communication that the discloser knew or should have known was obtained through the interception of a wire, oral or electronic communication.  Fla. Stat. 934.03(1).

115.   Any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, a wire, oral or electronic communication in violation of the FSCA is subject to a civil action for: (1) actual damages, not less than liquidated damages computed at a rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.  Fla. Stat. 934.10.

116.   At all relevant times, Defendant procured Google to contemporaneously track and intercept Plaintiff's and Class Members' internet communications while navigating the Website.  Defendant procured Google to contemporaneously intercept these communications without authorization and consent from Plaintiff and Class Members.

35

117.   Defendant, when procuring Google to intercept Plaintiff's and Class Members' communications, intended Google to contemporaneously learn the meaning of the content of Plaintiff's and Class Members' communications with Defendant.

118.   Plaintiff and Class Members had a justified and reasonable expectation under the circumstances that their electronic communications would not be intercepted.

119.   Plaintiff and Class Members were not aware that their electronic communications were being intercepted by Google and did not consent to the interception.

120.   In connection with procuring Google's contemporaneous interception of Plaintiff's and Class Members' communications with Defendant, Defendant embedded the Google tracking tools on the Website.

121.   The Google tracking tools constitute an electronic or other device through which the contents of a wire, oral and electronic communication can be acquired, including the contents of Plaintiff's and Class Members' communications with Defendant via the Website.

36

## COUNT II
### Violation of the Electronic Communications Privacy Act ("ECPA")
### 18 U.S.C. § 2511(1) *et seq.*

122. Plaintiff incorporates by reference the allegations contained in paragraphs 1-111 above as if fully set forth herein.

123. Plaintiff brings this Count individually and on behalf of the members of the Class.

124. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

125. The ECPA protects both the sending and the receipt of communications.

126. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

127. The transmission of Plaintiff's PII and PHI to Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

128. The transmission of PII and PHI between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature

37

transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

129. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

130. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

131. The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5).

132. The following instruments constitute "devices" within the meaning of the ECPA:

   a. The computer codes and programs Defendant and Google used to track Plaintiff and Class Members communications while they were navigating the Website;

   b. Plaintiff's and Class Members' browsers;

   c. Plaintiff's and Class Members' mobile devices;

   d. Defendant's and Google's web and ad servers;

e.  The plan Defendant and Google carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

133.  Plaintiff's and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

134.  By utilizing and embedding the Tracking Technologies provided by Google on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

135.  Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the Tracking Technologies provided by Google on the Website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and PHI to third parties, such as Google.

136.  Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding PII and PHI, including their identities and information related to the dental services they received.  This confidential information is then monetized for targeted advertising purposes, among other things.

39

137. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

138. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

139. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, HIPAA and invasion of privacy, among others.

140. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3).  This provision

40

imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IIHI") to a third party.  HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[31]

141.    Plaintiff's information that Defendant disclosed to Google qualifies as IIHI, and Defendant violated Plaintiff's and Class Members' expectations of privacy.  Such conduct constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6.  Defendant used the electronic communications to increase its profit margins.  Defendant specifically used the Tracking Technologies provided by Google to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

142.    Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

143.    Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy.  Plaintiff and Class Members, all of whom are patients of

---

[31] 42 U.S.C. § 1320d-6.

41

Defendant, had a reasonable expectation that Defendant would not redirect their communications to Google without their knowledge or consent.

144. The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq*.

145. As a result of each and every violation thereof, on behalf of themselves and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, *et seq*. under 18 U.S.C. § 2520.

## COUNT III
### Breach of Confidence

146. Plaintiff incorporates by reference the allegations contained in the paragraphs 1–111 above as if fully set forth herein.

147. Plaintiff brings this Count individually and on behalf of the members of the Class and Florida Subclass.

148. Medical providers have a duty to their patients to keep non-public medical information completely confidential.

149. Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

150. Contrary to its duties as a medical provider, Defendant installed Tracking Tools to disclose and transmit Plaintiff's and Class Members' communications, including their PII and PHI, to third parties such as Google.

42

151. These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

152. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

153. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class Members were damaged by Defendant's breach in that:

    a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

    b. Plaintiff and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

    c. Defendant eroded the essential confidential nature of the provider-patient relationship;

    d. General damages for invasion of their rights in an amount to be determined by a jury;

    e. Nominal damages for each independent violation;

    f. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members'

knowledge or informed consent and without compensation for such data;

g.  Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h.  Defendant's actions diminished the value of Plaintiff's and Class Members' PII and PHI; and

i.  Defendant's actions violated the property rights Plaintiff and Class Members have in their PII and PHI.

## COUNT IV
### Unjust Enrichment

154.  Plaintiff incorporates by reference the allegations contained in the paragraphs 1–111 above as if fully set forth herein.

155.  Plaintiff brings this Count individually and on behalf of the members of the Class and Florida Subclass.

156.  Defendant benefits from the use of Plaintiff's and Class Members' PII and PHI and unjustly retained those benefits at their expense.

157.  Plaintiff and Class Members conferred a benefit upon Defendant in the form of PII and PHI that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation.  Defendant consciously collected and used this information for its own gain, providing Defendant with

44

economic, intangible, and other benefits, including substantial monetary compensation.

158. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

159. The benefits that Defendant derived from Plaintiff and Class Members were not offered by Plaintiff and Class Members gratuitously and rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles in Florida and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

160. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

    a. Determining that this action is a proper class action;

b.  For an order certifying the Classes, naming Plaintiff as representative of the Classes, and naming Plaintiff's attorney(s) as Class Counsel to represent the Classes;

c.  For an order declaring that Defendant's conduct violates the statutes referenced herein;

d.  For an order finding in favor of Plaintiff and the Classes on the counts asserted herein;

e.  Awarding compensatory damages, including statutory damages where available, to Plaintiff and Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f.  For punitive damages, as warranted, in an amount to be determined at trial;

g.  Ordering Defendant to disgorge revenues and profits wrongfully obtained;

h.  For prejudgment interest on all amounts awarded;

i.  For injunctive relief as pleaded or as the Court may deem proper;

j.  For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit; and

k. Granting Plaintiff and Class Members such further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable in this action.

Dated:  January 15, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:___*/s/ Stephen A. Beck*___
        Stephen A. Beck

Sarah N. Westcot
Stephen A. Beck (Lead Counsel)
701 Brickell Avenue, Suite 2100
Miami, FL 33133
Telephone:  (305) 330-5512
Facsimile:  (305) 679-9006
Email:        swestcot@bursor.com
                 sbeck@bursor.com

*Counsel for Plaintiff*

47